## Case No. 16,527.

UNITED STATES v. TOBACCO.

[See Case No. 16,106a.]

## Case No. 16,528.

UNITED STATES v. TOBACCO FACTORY.

[13 Int. Rev. Rec. 91; 1 Dill. 264.] [1]

District Court, W. D. Arkansas. May Term, 1870. [2]

INDIAN COUNTRY—JURISDICTION OF UNITED STATES — CONSTITUTIONAL LAW — TREATIES — INTERNAL REVENUE LAWS.

1. The Indian country is within the jurisdiction of the United States, and congress may extend all laws within the constitutional limits of municipal legislation over the same.

2. The internal revenue laws imposing taxes on manufactured tobacco are in force in the Indian country.

3. Though a treaty is the law of the land, under the constitution of the United States, congress may abrogate it, so far as it is a municipal law, provided its subject-matter is within the legislative power of congress.
[Cited in Buckner v. Street, Case No. 2,098.]

4. So much of article 10 of the treaty of July 19, 1866 [14 Stat. 801], between the United States and the Cherokee Nation as is repugnant to the provisions of the act of congress of July 20, 1868 [15 Stat. 125], imposing taxes on manufactured tobacco, is thereby abrogated.

J. H. Huckelberry, U. S. Dist. Atty., W. G. Whipple, and E. D. Ham, for the United States.
Jesse Turner and Granville Wilcox, for claimant.

CALDWELL, District Judge. This is an information against a tobacco manufactory, established and carried on in the Cherokee Nation, in the Indian Territory. The claimant, E. C. Boudinot, alleges that he is a Cherokee Indian, and claims that he has a right to establish and carry on the business of manufacturing and selling tobacco in the Indian country, without complying in any respect with the provisions of the internal revenue laws on that subject. This claim is urged upon three grounds: First, that it is not competent for congress to extend any portion of the internal revenue laws over the Indian country; second, that section 107 of the act of July 20, 1868, nor any other provision of that act, was intended to extend such laws over that country; third, that if that was the intention of the act of July 20, 1868, it cannot have that effect, because it would be inconsistent with article 10 of the treaty of July 19, 1866, between the Cherokee Nation and the United States.

1. Counsel for claimant have argued that the Cherokees are a nation of people independent of the United States, and possessing all the rights of an independent sovereign power, except in so far as they have surren-

---

[1] [1 Dill. 264, contains only a partial report.]
[2] [Affirmed in 11 Wall. (78 U. S.) 616.]

dered those rights by treaty stipulations with the United States, and the language of certain treaties between the Cherokee Nation and the United States is referred to as tending to establish this position. It must be confessed that the language of some of these treaties is well calculated to flatter the pride of the Indian tribes, and. give them a very erroneous notion of the actual legal relation they sustain to the national government. The converse of this proposition advanced by counsel for claimant is the law. The power of the national government over the Indian tribes and the territory occupied by them, within the constitutional limits of municipal legislation, is plenary. To what extent this power will be exercised rests in the sound discretion of congress, limited only by those considerations of policy and humanity that have always marked the action of the government in its treatment of these people.

In Cherokee Nation v. State of Georgia, 5 Pet. [30 U. S.] 1, Chief Justice Marshall says: "The condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence. In the general, nations not owing a common allegiance are foreign to each other, * * * but the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else. The Indian Territory is admitted to compose part of the United States. In all our maps, geographical treatises, histories, and laws, it is so considered. * * * They acknowledge themselves in their treaties to be under the protection of the United States; they admit that the United States shall have sole and exclusive right of regulating trade with them, and managing all their affairs as they think proper. * * * They may, more correctly perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian."

In Worcester v. State, 6 Pet. [31 U. S.] 515, Justice Washington says (page 519): "Are not the United States sovereign within their territories? And has it ever been conceived by any one that the Indian governments which exist in the territories are incompatible with the sovereignty of the Union? * * * Does not the constitution give to the United States as exclusive jurisdiction in regulating intercourse with the Indians as has been given to them over any other subjects? Is there any doubt as to the investiture of power? Has it not been exercised by the federal government ever since its formation, not only without objection, but under the express sanction of all the states? * * * Has not the power been expressly conferred on the federal government to regulate intercourse with the Indians; and is it not as exclusively given as

any of the powers above enumerated? There being no exception to the exercise of this power, it must operate on all communities of Indians exercising the right of self-government, and consequently include those who reside within the limits of a state, as well as others."

In Mackey v. Coxe, 18 How. [59 U. S.] 100, Justice McLean, in delivering the opinion of the court, says: "A question has been suggested whether the Cherokee people should be considered and treated as a foreign state or territory. The fact that they are under the constitution of the Union, and subject to acts of congress regulating trade, is a sufficient answer to the suggestion. They are not only within our jurisdiction, but the faith of the nation is pledged for their protection. In some respects they bear the same relation to the federal government as a territory did in its second grade of government under the ordinance of 1787. Such territory passed its own laws, subject to the approval of congress; and its inhabitants were subject to the constitution and acts of congress. The principal difference consists in the fact that the Cherokees enact their own laws, under the restrictions stated, appoint their own officers, and pay their own expenses. This, however, is no reason why the laws and proceedings of the Cherokee Territory, so far as relates to rights claimed under them, should not be placed upon the same footing as other territories in the Union. It is not a foreign, but a domestic territory—a territory which originated under the constitution and laws of the United States. * * * The Cherokee country, we think, may be considered a territory of the United States, within the act of 1812. [2 Stat. 758.] In no respect can it be considered a foreign state or territory, as it is within our jurisdiction and subject to our laws."

The same doctrine is maintained in U. S. v. Rogers, 4 How. [45 U. S.] 567, and "Kansas Indians," 5 Wall. [72 U. S.] 737. In the case last cited Justice Davis, in delivering the opinion of the court, says: "If the tribal organization of the Shawnees is preserved intact, and recognized by the political department of the government as existing, then they are a people distinct from others, capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union." In the case last cited the authority of the United States to exercise exclusive power of government over Indian tribes and the territory occupied by them, is maintained even after such tribes and territory have been included within the limits of a state.

Ever since the organization of this court it has sat here administering and enforcing the laws of the United States over the Indian country. Indians are taken from that country, brought here for trial, and are tried and punished—in some instances capitally. They are prohibited from trafficking in certain articles. Until recently they could not sell their

cattle without the permission of the United States agent. 13 Stat. 563, §§ 8, 9. They cannot alienate their lands, neither can they permit citizens of the United States to settle in their country without the consent of the United States. By permission of the United States they have jurisdiction of offences committed by one Indian on the person or property of another Indian. But this power is granted them from considerations of policy, and no one doubts that congress might invest this court with that jurisdiction. They are without a single attribute that marks a sovereign and independent nation or people.

2. Does the act of July 20, 1868, extend the internal revenue laws imposing taxes on tobacco, snuff, and cigars, to such articles produced within the Indian country? Section 107 of that act declares "that the internal revenue laws imposing taxes on distilled spirits, fermented liquors, tobacco, snuff, and cigars, shall be held and construed to such articles produced anywhere within the exterior boundaries of the United States, whether the same shall be within a collection district or not." It is admitted that the Cherokee Nation is "within the exterior boundaries of the United States."

Notwithstanding the comprehensive language of this section, it is claimed that it cannot be construed to embrace the Indian country. It is said that the Indians and the Indian Territory are not to be affected by the general laws of the United States unless they are specifically mentioned. It is true that many of the general laws of the United States have no application to the Indians or the Indian country, and this for reasons that are obvious. But it is not true that an act of congress that by a fair construction includes the Indians and the Indian country, cannot operate upon that people and their territory unless they are specifically mentioned. There is no rule of law or of construction that will authorize the court to disregard the plain words of the act of congress and say that the Indian country is not "within the exterior boundaries of the United States," and that the revenue laws relating to tobacco do not extend to that country and its people. I am unwilling to inject into this statute a clause exempting the Indian country from its operation. Before the court could do this it must be satisfied that such exemption was fairly implied in the statute. The language of the section will not admit of any such implication. On the contrary, when taken in connection with the other provisions of the act extending its operations over the states, the District of Columbia, and the "territories" of the United States, it is plain that section 107 was inserted on purpose to prevent any such exemption or claim as is here set up. We know that the Indian country is within "the exterior boundaries of the United States," and subject to the jurisdiction of the national government, and that it is competent for

congress to extend any or all of the internal revenue laws over the same. And this can as well be done by general language that necessarily embraces that country, as by specifically mentioning it. That the general term "territories" in an act of congress, may be held to include the Indian Territory, has been expressly decided by the supreme court of the United States. By the 11th section of the act of the 24th of June, 1812, it is provided "that it shall be lawful for any person or persons to whom letters testamentary or of administration hath been or may hereafter be granted by the proper authority in any of the United States or territories thereof, to maintain any suit or action, and to prosecute and recover any claim in the District of Columbia in the same manner as if the letters testamentary or administrative had been granted in the district." The Cherokees have their own local laws not inconsistent with the laws of the United States, and among them laws regulating the descent of property and the administration of estates. Under those laws letters of administration were granted upon the estate of one Mackey. In a suit brought in the circuit court of the United States, in the District of Columbia, the validity of the letters of administration granted on the estate of Mackey by the probate court in the Indian country was drawn in question, and in that case, as in this, it was contended that the word "territories" in the act of 1812 above quoted did not extend to or embrace the Cherokee country. In answer to this objection, the supreme court of the United States says: "The Cherokee country, we think, may be considered a territory of the United States within the act of 1812. In no respect can it be considered a foreign state or territory, as it is within our jurisdiction and subject to our laws." Mackey v. Coxe, 18 How. [59 U. S.] 100. Not only is the Indian Territory embraced within the letter of section 107, but it is also within the reason and policy of the internal revenue laws relating to the manufacture of tobacco. No one can read the acts of congress relating to the manufacture and sale of tobacco without being forced to the conclusion that it was the object and purpose of those acts to compel the payment of the required tax upon every pound of tobacco manufactured and consumed within the limits of the United States. Congress has taken every precaution that the ingenuity of legislators could devise to secure that end. Every step necessary to be taken by any one engaged in the manufacture of tobacco is hedged in by numerous requirements, all of which are obviously intended to insure the payment of the required tax on every ounce of manufactured tobacco consumed anywhere within the limits of the United States. This luxury may not be enjoyed by any one, be he white man or Indian, without the required tax has first been paid thereon. The same precautions are taken to insure the

payment of the tax on tobacco imported from foreign countries. See section 77.

The claimant in this case insists that he may purchase the raw material outside the Indian country, take it into that country, and there manufacture and sell it to any one who will purchase, be he Indian or white man, without paying any tax thereon; that he is only required to pay tax on tobacco thus obtained and manufactured, when he sells it outside the Indian Territory; that he is not required to conform to the method of packing, marking, and stamping tobacco prescribed by the act; but that he may pack his tobacco as he chooses, or not pack it at all, and transport it beyond the limits of the Indian country, and that until it is so transported and sold he is not required to comply with any of the provisions of the act. If this position be true, then all the precaution and ingenuity taken by congress to insure the payment of the tax upon all the tobacco manufactured and consumed within the United States, and to prevent frauds upon the revenue, become fruitless. If the claimant may lawfully do what he claims, then all must admit that this Indian country will—as indeed in some measure it has already—become the asylum for all tobacco manufacturers who desire to evade the provisions of the act relating to the manufacture and sale of tobacco. It is no answer to say that none but Indians can avail themselves of such privileges. The cases arising under this act at the present term of the court show how easy it is for white men to procure and use the name of an Indian when they desire to avail themselves of the supposed advantages of carrying on this business in the Indian country. The extent and magnitude of the evil that would necessarily grow out of the construction claimed for this law by the counsel for claimant will be appreciated, when we reflect that this country in territorial extent is equal to the largest state in the Union, that it is accessible by railroads and water lines of communication, and it is in the track of the great highways leading from Missouri and Kansas to the Gulf states, and from Arkansas, and other southern states to the western territories and the Pacific coast. It will readily be seen that, under such a construction of the act, the facilities for committing frauds upon the revenue in the matter of the manufacture and sale of tobacco would be boundless, and the territory would at once become the chosen home of smugglers, and all others who desire to grow rich by such practices. These considerations doubtless influenced congress to extend the internal revenue laws imposing taxes on tobacco over that country.

In what I have said in reference to the frauds committed by those who might engage in the manufacture of tobacco in that country, I do not wish to be understood as reflecting on the claimant in this case.

There is nothing in this case, as submitted to the court and jury, to show that he was engaged in any such practices. He seems to have acted in good faith, supposing the law to be as he claimed it. In this he was mistaken, and his manufactory and tobacco are as much subject to forfeiture as if he had in fact acted with the most fraudulent motives.

If section 107 does not embrace this Indian country, neither does it embrace other Indian territory, and the result is that in all the territories, and even in some states, where Indians occupy territory not subject to state laws and state jurisdiction, the country occupied by Indians is free from the operation of this act.

But it is said that this Indian country is not within any collection district. The answer to this objection is found in the very language of the section itself, which declares that the internal revenue laws imposing taxes on tobacco shall extend to such articles produced anywhere within the exterior boundaries of the United States, "whether the same be within a collection district or not." It certainly is within the jurisdiction of this court, and this court has the same authority to punish for a violation of the provisions of the act committed in that country that it has to punish for a like offence in this state. And it is no objection to the exercise of this jurisdiction that the Indian Territory was not included within a collection district, and that parties engaging in the manufacture of tobacco in that country could not comply with the requirements of the act if they had desired to do so. Inability to comply with the requirements of the internal revenue act, from whatever cause, cannot be held to justify a violation of its provisions.

Why should these Indians, who have attained to such a degree of civilization, and have so long mixed with the white citizens of the United States as to be scarcely distinguishable from them, enjoy privileges with reference to the manufacture and sale of tobacco not enjoyed by citizens of the United States? Privileges, too, that, in their very nature, must be injurious to the citizens of the United States, and that will inevitably lead to great frauds upon the revenue of that government. The power to tax is an attribute of sovereignty, and the right of the national government to impose and collect taxes within the constitutional limits of that power on all persons within its jurisdiction, be they Indians or not, cannot be questioned.

3. Article 10 of the treaty between the Cherokee Nation and the United States, of the 19th of July, 1866, is in the following words: "Every Cherokee and freed person resident in the Cherokee Nation shall have the right to sell any products of his farm, including his or her live stock, or any merchandise or manufactured products, and

to ship and drive the same to market without any restraint, paying any tax thereon which is now or may be levied by the United States on the quantity sold outside of the Indian Territory." It is insisted that this article of the treaty is paramount to the act of congress passed July 20, 1868, and that it cannot be superseded or infringed by any act of congress whatever.

Counsel for claimant was mistaken in supposing that congress may not repeal or abrogate a treaty, so far as it is a municipal law, provided its subject-matter is within the legislative power of congress. That identical question has been ruled upon in several cases. In Taylor v. Morton [Case No. 13,-799], Mr. Justice Curtis says: "Several questions involved in this position require examination. One of them, when stated abstractly, is this: If an act of congress should levy a duty upon imports which an existing commercial treaty declares shall not be levied, so that the treaty is in conflict with the act, does the former or latter give the rule of decision in a judicial tribunal of the United States, in a case to which one rule or the other must be applied?" The second section of the fourth article of the constitution is: "This constitution, and the laws of the United States, which shall be made in pursuance thereof, and all treaties made. or which shall be made, under the authority of the United States, shall be the supreme law of the land." There is nothing in the language of this clause which enables us to say that in the case supposed the treaty, and not the act of congress, is to afford the rule. There is, therefore. nothing in the mere fact that a treaty is a law, which would prevent congress from repealing it. Unless it is for some reason distinguishable from other laws, the rule which it gives may be displaced by legislative power at its pleasure. Judge Curtis proceeds in this case, in an able and exhaustive argument, to show that there is nothing in the constitution which makes treaties relating to matters within the scope of municipal legislation, paramount to a subsequent act of congress repealing or abrogating the same. The same learned judge. in his opinion in the case of Dred Scott v. Sandford. 19 How. 629, 630, says: "No supremacy is assigned to treaties over acts of congress. That they are not perpetual, and must be in some way repealable, all will agree." And he reaffirms with emphasis his opinion in the case above cited.

In Re Clinton Bridge [Case No. 2,900], it was contended that the act of congress of February 27, 1867 (16 Stat. 412), was in violation of certain treaties between the United States and foreign nations, which declare, in effect, that the navigation of the Mississippi river shall remain free and unobstructed forever. In response to this objection, Justice Miller says: "In reference to the first of these objections. we need not enquire whether those treaties were designed to affect such cases as the one before us, or not; for we are of opinion that, whatever obligation they may have imposed upon our government, the court possesses no power to declare a statute passed by congress, and approved by the president, to be void because it may violate such obligations. Those are international questions, to be settled between the foreign nations interested in the treaties and the political departments of our government. When those departments declare a treaty abrogated, annulled, or modified, it is not for the judicial branch of the government to set it up, and assert its continual obligation. If the court could do this, it could annul declaration of war, suspend the levy of armies, and become a grand international arbiter, instead of a court of justice, for the administration of the laws of the United States."

In Webster v. Reid, Morris (Iowa) 467, it was contended that the act of congress of 1834 was repugnant to the treaty made in 1824 between the United States and the Sac and Fox tribe of Indians, and was therefore void. Mason, Chief Justice, in delivering the opinion of the court, says: "Nor is it material, so far as the efficacy of this act of 1834 is concerned, whether or not it violates the treaty of 1824 by making a different disposition of those lands from what was stipulated for in that treaty. Government is certainly under the strongest moral obligation to preserve inviolate the faith of all treaties; but if the legislative power, which in such matters is sovereign, sees proper to violate this duty, there is no power in the judiciary to prevent it. True, a treaty is by the constitution declared to be a supreme law of the land, but so is an act of congress. The latter may repeal the former in the same manner that one statute may repeal another."

Upon the authority of these cases, I have no difficulty in holding that the article of the treaty in question is superseded and annulled by the act of 1868, in so far forth as it is repugnant thereto. In no event can the claimant maintain his claim under this article of the treaty. If it is repugnant to the act of 1868, it is abrogated. If it can receive an interpretation to make it consistent with the act of 1868, it will not help the claimant, because he has failed utterly to comply with the treaty itself when so interpreted. The article requires the tax to be paid upon the quantity sold outside the Indian Territory. When and how is this tax to be paid? The article is silent on this point. It evidently contemplates that the tax shall be paid at the place and in the time and manner prescribed by law for the payment of the tax on like articles manufactured elsewhere. All tax upon manufactured tobacco must be paid at the place of manufacture or before removal from a bonded warehouse. The law points out with great particularity how the same shall be packed, marked and stamp-

ed. And it might well be held that the legal effect of the last clause of the article in question is the same as if it read, paying on the quantity—sold outside of the Indian Territory—any tax which is now or may be levied by the United States thereon at the time and place and in the manner that is now or may be prescribed by law for like articles manufactured elsewhere in the United States.

The ruling in this case covers the points raised in a number of other cases of the same character—pending in court, and those cases will be disposed of in accordance with the ruling here made.

[The above judgment was affirmed by the supreme court in 11 Wall. (78 U. S.) 616.]